# EXHIBIT 2

| | |
|---|---|
| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>270 S. Tejon<br>Colorado Springs, CO 80903<br>719-452-4000 | |
| **Plaintiff:**<br>ANDREY GEVA, ABDEL SALEM,<br>as directors, derivatively on behalf of the USA<br>FENCING, a Colorado nonprofit corporation<br><br>v.<br><br>**Defendants:**<br>USA FENCING and DAMIEN LEHFELDT;<br>MOLLY HILL; KAT HOLMES; LAURYN DELUCA;<br>JACKIE DUBROVICH, ANDREA PAGNANELLI | ▲ **COURT USE ONLY** ▲ |
| **Attorneys for Defendants:**<br>Tamara A. Seelman, #29391<br>Melissa A. Wiese, #27537<br>Katherine A. Cunliffe, #58150<br>GORDON REES SCULLY MANSUKHANI, LLP<br>555 Seventeenth Street, Suite 3400<br>Denver, CO 80202<br>Tel: (303) 534-5160<br>Fax: (303) 534-5161<br>Email:  tseelman@grsm.com<br>        mwiese@grsm.com<br>        kcunliffe@grsm.com | Case No.:  2025 cv 31304<br><br>Div.  21 |
| **DEFENDANTS' MOTION TO REVOKE *PRO HAC VICE* ADMISSION OF<br>PLAINTIFFS' COUNSEL XIAOLIN WANG** | |

Defendants USA Fencing, Damien Lehfeldt, Molly Hill, Kat Holmes, Lauryn DeLuca,

Jackie Dubrovich, and Andrea Pagnanelli (collectively "Defendants"), through undersigned

counsel, move to revoke the *pro hac vice* admission of Plaintiffs' counsel Xiaolin Wang as follows:

**CERTIFICATION PURSUANT TO C.R.C.P. 121 § 1-15(8)**

Counsel for Defendants certifies she conferred with counsel for Plaintiffs concerning the

relief requested herein. Mr. Wang offered to withdraw his *pro hac vice* admission without

prejudice. Defendants are troubled in that the withdrawal would be "without prejudice" as there is no evidence Mr. Wang paid all of his past due registration fees and Defendants understand that paying the past due registration fees would be insufficient to reinstate his New York license.

## INTRODUCTION

Defendants respectfully move this Court to revoke the *pro hac vice* admission of Plaintiffs' counsel Xiaolin Wang on the grounds that his Verified Motion for Pro Hac Vice Admission contained material misrepresentations regarding the nature, cause, and status of his suspension from the practice of law in New York.

Mr. Wang has been suspended from the New York Bar since October 7, 2021. That suspension arose not as he claimed from pandemic-era hardship, but from his failure to meet his attorney registration obligations for a period spanning from 2016 through 2020 — four years before COVID-19 existed. That suspension remains in effect today. Despite representing to this Court in June 2025 that he had made all payments in arrears and was "in the process of being reinstated," Mr. Wang is still suspended, has not paid his New York registration fees since May 2023, has been listed as "delinquent" since April 2025, and does not appear to have taken any steps to actually seek reinstatement.

Making matters worse, Mr. Wang's explanation for his suspension — that he was "experiencing infirmity in China" during the COVID period and unable to access registration websites due to Chinese government internet restrictions — is contradicted by his own words in interviews he gave. News articles based on interviews with Mr. Wang show that during the COVID period he was living at home "in the Washington area," was "stuck in the U.S. as flights to China were grounded," and stated he "has no plans to return to China." He was not in China.

2

The integrity of the *pro hac vice* process depends on candor. When an out-of-state attorney seeks the privilege of appearing before a Colorado court, he assumes an obligation to accurately disclose his disciplinary history and current bar status. Mr. Wang did not honor that obligation. Instead, he provided an inaccurate account of his suspension that obscured a multi-year pattern of noncompliance, offered an excuse for his failures that was not supported by the record, and implied the matter was on its way to being resolved when it was not, and still is not.

Mr. Wang's admission was obtained through material misrepresentations which violates Colo. RPC 3.3(a)(1), 3.4(c), 4.1(a), 5.5(a)(2), and 8.4(c). As a result, his *pro hac vice* admission should be revoked.

## LEGAL STANDARD

Under C.R.C.P. 205.3, an out-of-state attorney seeking to appear in a Colorado state court matter must satisfy the conditions set forth in the rule, including filing a verified motion with the trial court and a copy of that motion with the Supreme Court Office of Attorney Registration. C.R.C.P. 205.3(2)(a)(i) and (iii).

The verified motion must include a statement identifying all jurisdictions in which the attorney "has been publicly disciplined or placed on disability inactive status…or in which the attorney has any pending formal disciplinary or disability proceeding, including…the date of the action, the nature of the violation, and the penalty imposed." C.R.C.P. 205.3(2)(b)(iii). The attorney must also acknowledge that he is subject to the Colorado Rules of Professional Conduct, the Colorado Rules of Civil Procedure, and other applicable court rules. C.R.C.P. 205.3(2)(b)(v).

The consequences for misrepresentation in a *pro hac vice* application are severe. Bar admissions must be voided where an applicant makes materially false statements reflecting on his

3

fitness to practice law. *People v. Culpepper*, 645 P.2d 5, 6 (Colo. 1982) (bar admission voided where applicant submitted false transcript and falsely represented he had obtained a bachelor of arts degree.)

Making false statements in a *pro hac vice* application violates Rules 3.3(a)(1), 3.4(c), 4.1(a) and 8.4(c) of the Colorado Rules of Professional Conduct and can result in disbarment. *People v. Pruit*, 452 P.3d 259, 260 (Colo. O.P.D.J. 2019) (Texas attorney violated Colo. RPC 3.3(a)(1), 3.4(c), 4.1(a) and 8.4(c) and was disbarred after he falsely certified on his *pro hac vice* application that he was not subject to any disciplinary proceedings when he was suspended in Texas and presented a forged Texas suspension agreement to Colorado local counsel who was sponsoring his application.)

The relevant rules provide:

- **Colo. RPC 3.3(a)(1):** A lawyer shall not knowingly "make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

- **Colo. RPC 3.4(c):** A lawyer shall not knowingly "disobey an obligation under the rules of a tribunal."

- **Colo. RPC 4.1(a):** A lawyer shall not knowingly "make a false statement of material fact or law to a third person."

- **Colo. RPC 8.4(c):** It is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

- **Colo. RPC 5.5(a)(2):** A lawyer shall not "practice law in a jurisdiction where doing so violates the regulations of the legal profession in that jurisdiction."

**RELEVANT FACTS**

On June 17, 2025, Plaintiffs' counsel Xiaolin Wang signed and filed in this matter an Out of State Counsel's Verified Motion Requesting Pro Hac Vice Admission ("Verified Motion".) Regarding his New York suspension, Mr. Wang stated:

> Xiaolin Wang was suspended by the New York Bar solely due to failure to registered [*sic*] during the COVID period where he was experiencing infirmity in China with no internet access to websites outside of China (Chinese government has been blocking internet access to websites outside of China). He has have [*sic*] since made all payments in arears [*sic*] and is in the process of being reinstated.

*See* Verified Motion ¶ 3. The Verified Motion cites to an attached affidavit signed by Mr. Wang filed as "Protected." *See* Verified Motion ¶ 10.

The Court granted his Verified Motion the same day. *See* Order: Out of States Counsels Verified Motion Requesting Pro Hac Vice Admission Xiaolin Wang, dated June 17, 2025.

On June 26, 2025, the Colorado Supreme Court filed two significant documents.

*First*, an advisement stating "a disciplinary history obtained by the Office of Attorney Regulation revealed adverse information in New York for Xiaolin Wang," and that the relevant New York order would be transmitted to the Court. *See* Supreme Court of Colorado Attorney Registration Office Pro Hac Vice Admission filed June 26, 2025.

*Second*, a document titled "State of New York Supreme Court, Appellate Division: Suspension." Although filed as "Protected" in this matter, this document is publicly available through the New York State Bar's online attorney directory at https://iapps.courts.state.ny.us/attorneyservices/. A search for Mr. Wang on this site shows his

5

New York license is currently listed as "Suspended, delinquent", with disciplinary history on record:



| Name ⬍ | Registration Number ⬍ | City ⬍ | State ⬍ | Oath Date ⬍ | Registration Status ⬍ | Disciplinary History |
|---|---|---|---|---|---|---|
| WANG, XIAOLIN | 3018629 | MCLEAN | Virginia | 2000 | Suspended, delinquent | Yes |

Clicking on Mr. Wang's name reveals the following showing he is affiliated with Saleen Motors Int'l (not the law firm Mahdavi, Bacon, Halfhill & Young, PLLC), that his license is "Suspended, delinquent", that the effective date of his suspension is October 7, 2021, and a link to "View Discipline."



**Attorney Detail Report**                                      *as of 05/02/2026*

Registration Number: 3018629
Name: XIAOLIN WANG
Business Name: SALEEN MOTORS INT'L
Business Address: 1361 HARDISON LN
                  MCLEAN, VA 22102-2241
Business Phone: (202) 676-6189
Email: wangxcharlie@gmail.com
Date Admitted: 01/25/2000
Appellate Division Department of Admission: 3rd
Law School: Duke University School of Law
Registration Status: Suspended, delinquent
Next Registration: Jul 2026

**Disciplinary History**

Suspension Effective Date: 10/07/2021
*Ordered by Appellate Division 3rd Department*
View Discipline ↗

Clicking on "View Discipline" reveals the document filed in this case as "Protected" in on June 26, 2025. It is therefore a publicly available document.

This document is an order from the New York Supreme Court dated October 7, 2021 ("New York Order") that suspends Mr. Wang and a number of other attorneys because they "failed to

fulfill their respective attorney registration obligations for at least two consecutive biennial registration periods **since 2016**." *See* New York Order at p. 1 (emphasis added.) New York requires attorneys to register biennially within 30 days of their birthdate. *Id.*, p. 2. Mr. Wang's name appears on page 42 of that order, reflecting his failure to comply with registration requirements spanning the 2016 through 2020 periods.

A Freedom of Information Law ("FOIL") request yielded additional detail. Letters from New York State Unified Court System dated February 6, 2026 ("February 6 Letter"), Ex. A and February 10, 2026 ("February 10 Letter") Ex. B confirm the following:

- Mr. Wang failed to register or pay his registration fee for any period from 2016 through 2022.

- On May 23, 2023, Mr. Wang made a single bulk payment covering registration fees for 2016 through 2023. That payment did not cure his suspension — on June 13, 2023, the New York Division of Professional and Court Services mailed Mr. Wang a "Current/Suspended Letter," and he is still suspended.

- Mr. Wang's last registration was for the 2022–2023 biennial period. He has made no registration payments since.

- As of April 2025 — two months before he filed his Verified Motion — Mr. Wang was also listed as "Delinquent" for the 2024–2025 registration period.

- The February 10 Letter details the extensive notification history, reflecting notices mailed to Mr. Wang in 2016–2018 and again in 2020–2025.

*See* Exhs. A and B.

In sum, Mr. Wang has been suspended since October 7, 2021 as a result of his failure to comply with registration requirements stretching back to 2016 and he has made no meaningful effort to cure that suspension. His one and only attempt, a bulk payment of past-due fees in May 2023, fell short and left his suspended status entirely intact. Nothing has changed since.

## ARGUMENT

Mr. Wang's *pro hac vice* admission should be revoked because the representations in his Verified Motion were materially false, in violation of Colo. RPC 3.3(a)(1), 3.4(c), 4.1(a), 5.5(a)(2), and 8.4(c). As detailed below, Mr. Wang made three distinct misrepresentations that are unsupported.

*First*, Mr. Wang's claim that he was suspended "solely due to failure to registered [sic] during the COVID period" is contradicted by the record. The New York Order, the February 6 Letter, and the February 10 Letter uniformly establish that his suspension arose from his failure to comply with registration requirements dating back **to 2016** — a full four years before the COVID-19 pandemic began in early 2020.

Mr. Wang's invocation of COVID-19 as an explanation is chronologically impossible. A pandemic that began in 2020 cannot account for registration failures that began in 2016. Moreover, the February 10 Letter documents that the New York Division of Professional and Court Services mailed notices to Mr. Wang regarding his registration obligations in 2016, 2017, and 2018 — years before COVID-19 existed (Ex. B). He was on notice of his delinquency long before any pandemic-related disruption could have played a role. His claim that he lacked internet access due to being in China during the COVID period (discussed in more detail below) is similarly unavailing for the same reason: the registration records reflect that his delinquency began years before that period.

8

This misrepresentation is material. Under C.R.C.P. 205.3(2)(b)(iii), a verified motion for *pro hac vice* admission must accurately identify all jurisdictions in which the applicant has been publicly disciplined, including the nature of the violation. By attributing his suspension to a narrow and sympathetic COVID-era circumstance rather than a multi-year pattern of noncompliance predating the pandemic, Mr. Wang materially mischaracterized the nature of his disciplinary history. A court evaluating a *pro hac vice* application is entitled to accurate information about the scope and cause of an applicant's suspension. Mr. Wang did not provide it.

*Second*, Mr. Wang's representation that he had "since made all payments in arears [sic] and is in the process of being reinstated" was false when made on June 17, 2025, and is unsupported today. As to his claim that he had made "all payments in arrears": the record (Exhs. A and B) shows that as of the date of his Verified Motion, he had not paid his registration fees for the 2024–2025 biennial period and had been listed as "Delinquent" by the New York Bar since April 2025, two months before he filed his Verified Motion. His last payment was a bulk payment made on May 23, 2023, covering fees for 2016 through 2023 (Ex. A). He has made no registration payment since then.

As to his claim that he was "in the process of being reinstated": this representation has no basis in the record. There is no indication of a pending reinstatement proceeding. There is not even a current registration payment. Indeed, Mr. Wang's bulk payment in May 2023, his sole and only remedial act, was insufficient to cure his suspension, as confirmed by the "Current/Suspended Letter" the New York court sent him just weeks later on June 13, 2023 (Ex. B) and his current status reflecting he remains suspended as a result of the October 7, 2021 New York Order.

9

Yet two years later, on June 17, 2025, Mr. Wang represented to this Court that reinstatement was underway. The absence of any reinstatement activity in the New York court records, combined with his failure to maintain current registration payments, shows that this representation was not a good-faith characterization of work in progress but rather was a misstatement to minimize the significance of a suspension that remains in effect to this day.

Taken together, these misrepresentations go to the heart of the *pro hac vice* process. Courts rely on verified motions to assess whether an out-of-state attorney is in good standing and fit to appear before them. Mr. Wang's Verified Motion obscured the true duration and cause of his suspension and falsely suggested that remediation was already underway. That is precisely the conduct that *People v. Pruit* identified as warranting the most serious professional consequences. Revocation of his *pro hac vice* admission is an appropriate and necessary remedy.

*Third*, Mr. Wang's claim that he was "experiencing infirmity in China" during the COVID period is contradicted by his own statements in interviews. Contemporary news coverage establishes that Mr. Wang was not in China during the pandemic at all — he was stranded in the United States. A Fox Business article published August 8, 2020 reported on a police raid that occurred on June 29, 2020 at a company Mr. Wang owned in China, and was in part based on an interview with Mr. Wang. *See* Ex. C. Notably, the article describes Mr. Wang as a "former attorney at a New York law firm" — a telling characterization. More to the point, the article states that everything "was going to plan" for Mr. Wang's Chinese business venture, "[t]hen the COVID-19 pandemic struck," leaving Mr. Wang "stuck in the U.S. as flights to China were grounded." *See* Ex. C. A separate article dated July 4, 2020, reporting on the collapse of the same venture, referenced a May 2020 interview in which Mr. Wang stated he "will remain in the US indefinitely."

10

*See* Ex. D. Most telling, a Los Angeles Times article dated August 13, 2020 — also reporting on the company's demise and based on a direct interview with Mr. Wang — stated Mr. Wang "has been at home in the Washington area during the COVID-19 pandemic" and that he "has no plans to return to China." *See* Ex. E.

These articles based on interviews with Mr. Wang flatly contradict his representation to this Court that he was in China during the COVID period and unable to access registration websites due to Chinese government internet restrictions. By his own account, he was in the United States where no such restrictions existed. His COVID-era explanation for his registration failures is chronologically implausible and factually inconsistent with public articles.

WHEREFORE, Defendants respectfully request the Court enter an order revoking the *pro hac vice* admission of Plaintiff's counsel Xiaolin Wang and enter any further orders this Court deems just.

Respectfully submitted this 6th day May, 2026.

GORDON REES SCULLY MANSUKHANI, LLP

*s/ Tamara A. Seelman*
Tamara A. Seelman, #29391
Melissa A. Wiese, #27537
Katherine A. Cunliffe, #58150

Attorneys for Defendants

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 6th day of May, 2026, a true and correct copy of the foregoing was filed and served via Colorado Courts E-Filing system, which will serve all counsel of record.

*s/ Linda S. Montoya*

| | |
|---|---|
| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>270 S. Tejon<br>Colorado Springs, CO 80903<br>719-452-4000 | DATE FILED<br>May 6, 2026 5:08 PM<br>FILING ID: C014F5C198D2B<br>CASE NUMBER: 2025CV31304 |
| **Plaintiff:**<br>ANDREY GEVA, ABDEL SALEM,<br>as directors, derivatively on behalf of the USA<br>FENCING, a Colorado nonprofit corporation<br><br>v.<br><br>**Defendants:**<br>USA FENCING; DAMIEN LEHFELDT;<br>MOLLY HILL; KAT HOLMES; LAURYN DELUCA;<br>JACKIE DUBROVICH, ANDREA PAGNANELLI | ▲ COURT USE ONLY ▲ |
| | Case No.: 2025 cv 31304<br><br>Div. 21 |

### ORDER GRANTING DEFENDANTS' MOTION TO REVOKE PRO HAC VICE ADMISSION OF PLAINTIFFS' COUNSEL XIAOLIN WANG

THIS MATTER having come before the Court on Defendants' Motion to Revoke *Pro Hac Vice* Admission of Plaintiffs' Counsel Xiaolin Wang ("Motion"), the Court having reviewed the Motion, any response thereto, the record in this matter, and being otherwise fully advised in the premises, hereby finds and orders as follows:

### FINDINGS OF FACT

1. On June 17, 2025, Plaintiffs' counsel Xiaolin Wang filed an Out of State Counsel's Verified Motion Requesting Pro Hac Vice Admission ("Verified Motion") in this matter pursuant to C.R.C.P. 205.3.

2. The Court granted the Verified Motion on June 17, 2025.

3.      On June 26, 2025, the Colorado Supreme Court Office of Attorney Registration filed an advisement with this Court stating that a disciplinary history check revealed adverse information in New York for Xiaolin Wang, along with a copy of the New York suspension order.

4.      The record establishes that Mr. Wang has been suspended from the practice of law in the State of New York since October 7, 2021, by order of the New York Supreme Court, Appellate Division, due to his failure to fulfill his attorney registration obligations for at least two consecutive biennial registration periods since 2016.

5.      In his Verified Motion, Mr. Wang represented he was suspended "solely due to failure to registered during the COVID period" while he was "experiencing infirmity in China" and lacked internet access due to Chinese government restrictions. This representation is materially false. The New York suspension order and records obtained through a Freedom of Information Law request establish Mr. Wang's registration delinquency commenced in 2016, four years before the COVID-19 pandemic began, and the New York Division of Professional and Court Services mailed notices to Mr. Wang regarding his registration obligations in 2016, 2017, and 2018.

6.      Contemporary news articles based on interviews with Mr. Wang show that during the COVID-19 pandemic, Mr. Wang was living in the Washington, D.C. area, was "stuck in the U.S. as flights to China were grounded," and stated he "has no plans to return to China." Mr. Wang's representation that he was in China and unable to access registration websites due to Chinese government internet restrictions is contradicted by his own public interview statements.

7.      In his Verified Motion, Mr. Wang further represented that he had "since made all payments in arears and is in the process of being reinstated." This representation is materially false. Records from the New York State Unified Court System establish that: (a) Mr. Wang's sole

2

remedial act was a bulk payment of past-due registration fees made on May 23, 2023, which did not cure his suspension; (b) Following that payment, the New York court issued Mr. Wang a "Current/Suspended Letter" on June 13, 2023, confirming that his suspended status remained in effect; (c) Mr. Wang has made no registration payments since May 2023; (d) As of April 2025 — two months before he filed his Verified Motion — Mr. Wang was listed as "Delinquent" for the 2024–2025 registration period; and (e) there is no indication that Mr. Wang has taken any steps to seek formal reinstatement.

8.     Mr. Wang's suspension from the New York Bar remains in full effect as of the date of this Order.

## CONCLUSIONS OF LAW

1.     C.R.C.P. 205.3 requires a verified motion for *pro hac vice* admission accurately disclose all jurisdictions in which the applicant has been publicly disciplined, including the nature of the violation. Mr. Wang's Verified Motion failed to satisfy this requirement.

2.     Mr. Wang's material misrepresentations in his Verified Motion violated the following Colorado Rules of Professional Conduct:

a.     **Colo. RPC 3.3(a)(1)**, which prohibits a lawyer from knowingly making a false statement of material fact or law to a tribunal;

b.     **Colo. RPC 3.4(c)**, which prohibits a lawyer from knowingly disobeying an obligation under the rules of a tribunal;

c.     **Colo. RPC 4.1(a)**, which prohibits a lawyer from knowingly making a false statement of material fact or law to a third person;

3

d.      **Colo. RPC 5.5(a)(2)**, which prohibits a lawyer from practicing law in a jurisdiction where doing so violates the regulations of the legal profession in that jurisdiction; and

e.      **Colo. RPC 8.4(c)**, which provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

3.      *Pro hac vice* admission is a privilege, not a right, and may be revoked where an applicant has made material misrepresentations in his application. *See People v. Pruit*, 452 P.3d 259, 260 (Colo. O.P.D.J. 2019).

4.      Revocation of Mr. Wang's *pro hac vice* admission is warranted and appropriate under the circumstances.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that:

1.      Defendants' Motion to Revoke *Pro Hac Vice* Admission of Plaintiffs' Counsel Xiaolin Wang is **GRANTED**.

2.      The *pro hac vice* admission of Xiaolin Wang, granted by this Court on June 17, 2025, is hereby **REVOKED**, effective immediately.

3.      Xiaolin Wang is prohibited from making any further appearances in this matter as counsel for any party.

4.      The Clerk of Court is directed to transmit a copy of this Order to the Colorado Supreme Court Office of Attorney Registration.

SO ORDERED this _____ day of _____, 2026.

BY THE COURT:

_____
District Court Judge

4



**New York State**
**Unified Court System**

Office of Court Administration · Division of Professional and Court Services

Justin A. Barry, Esq.
Executive Director

Daniel Weitz, Esq.
Director, Division of Professional
and Court Services

February 6, 2026



Dear ███████

<u>Re: Xiaolin Wang (Reg#3018629)</u>

In response to your request of February 3, 2026, a due and diligent search of the Attorney Registration records maintained by this office pursuant to Sections 468 and 468-a of the Judiciary Law has been conducted.

As per our records, Xiaolin Wang was admitted to the New York bar by the Appellate Division Third Department in 2000. Counselor Wang is listed as suspended by an order of the Appellate Division Third Department effective October 7, 2021. He is also listed as delinquent for the following registration period: 2024-2025.

You may contact the Appellate Division Third Department for further information on the suspension. Please find the address and telephone number below:

<div align="center">

**Appellate Division, Third Department**
P.O. Box 7288, Capitol Station
Albany, New York 12224-0288
(518) 471-4778
E-mail: <u>AD3AdmissionsOffice@nycourts.gov</u>
<u>http://www.nycourts.gov/ad3/</u>

</div>

As per your request, the following are the biennial periods and dates of Xiaolin Wang's registrations from 2000, when he was first admitted, to the present:

| **Biennial Period** | **Date Credited** | **Fee Amount** |
| --- | --- | --- |
| 2000-2001 | 01/03/2000 | $300 |
| 2002-2003 | 08/07/2002 | $300 |
| 2004-2005 | 07/26/2005 | $350 |
| 2006-2007 | 11/09/2007 | $350 |
| 2008-2009 | 12/22/2011 | $350 |
| 2010-2011 | 12/22/2011 | $350 |
| 2012-2013 | 06/27/2012 | $375 |

EXHIBIT A

| Biennial Period | Date Credited | Fee Amount |
|---|---|---|
| 2014-2015 | 06/02/2014 | $375 |
| 2016-2017 | 05/23/2023 | $375 |
| 2018-2019 | 05/23/2023 | $375 |
| 2020-2021 | 05/23/2023 | $375 |
| 2022-2023 | 05/23/2023 | $375 |

If you have any other questions or concerns, please feel free to contact me at your earliest convenience.

Very truly yours,

Martine Charles-Cator
Attorney Registration Unit

MC-C\HB

EXHIBIT A



**New York State**
**Unified Court System**

Office of Court Administration · Division of Professional and Court Services

**Justin A. Barry, Esq.**
Executive Director

**Daniel Weitz, Esq.**
Director, Division of Professional
and Court Services

February 10, 2026

██████████████
██████████████
████████ █ ██████

Dear ███████████

<u>Re: Xiaolin Wang (Reg#3018629)</u>

In response to your additional request of February 6, 2026, a due and diligent search of the attorney registration records maintained by this office pursuant to Sections 468 and 468-a of the Judiciary Law has been conducted.

Section 468-a of the Judiciary Law, and Part 118 of the Rules of the Chief Administrator of the Courts (22 NYCRR 118) require all attorneys duly admitted to the Bar of the State of New York, whether resident or non-resident, and whether or not in good standing, to file a biennial registration. All duly admitted NY attorneys are required to renew their attorney registration every two years, within 30 days of their date of birth. At the time of registration attorneys must either pay a biennial fee or certify that they are retired from the practice of law as defined in Part 118.1(g).

Counselor Wang last registered as required for the 2016-2017, 2018-2019, 2020-2021, and 2022-2023 biennial periods on May 23, 2023, which is the date it was credited by the Office of Court Administration. Date credited indicates the date the registration and payment (if applicable) were filed with our office. Xiaolin Wang was suspended by an order of the Appellate Division Third Department effective October 7, 2021, most likely due to the failure to file the biennial registration in a timely manner. Counselor Wang has yet to register and pay (if applicable) for the biennial period 2024-2025, due within 30 days of the birth date, in July 2024. As a result, an attorney's status in our system is listed as delinquent when they have failed to register and after we have sent a First, Second and Final Notice. Counselor Wang has been listed as Delinquent since April 2025.

New York does not have an inactive status, as may be available in other jurisdictions.

As per your request, below is a list of attempts made by our office to notify Counselor Wang of his registration requirements since 2016.

EXHIBIT B

| Notice Type | Date Sent |
|---|---|
| First Notice (2016-2017)- *sent via e-mail address on file* | 06/01/2016 |
| Second Notice (2016-2017)- *mailed to Bus. Address on file* | 11/01/2016 |
| Final Notice (2016-2017)- *mailed to home address on file* | 03/01/2017 |
| Delinquent Notice- *mailed to home address on file* | 06/01/2018 |
| Delinquent Notice- *mailed to home address on file* | 06/01/2020 |
| Delinquent Notice- *mailed to home address on file* | 06/01/2022 |
| Online Receipt- *generated after online registration* | 05/23/2023 |
| Current/Suspended Letter- *mailed to home address on file* | 06/13/2023 |
| First Notice (2024-2025)- *sent via e-mail address on file* | 06/01/2024 |
| Second Notice (2024-2025)- *mailed to Bus. Address on file* | 11/01/2024 |
| Final Notice (2024-2025)- *mailed to home address on file* | 03/01/2025 |

If you wish to file a complaint against the above attorney, please contact the following office:

**Third Judicial Department**
**Attorney Grievance Committee**
100 Great Oaks Blvd., Suite 129
Albany, New York 12203-7919
(518) 285-8350

As per your request, please find the attached copies of Counselor Wang's registration forms for the periods 2000, when first admitted, to 2006; and copies of the registration records from the 2008 to 2022 period, which were filed with our office electronically. We have redacted the social security number, home address, date of birth, pro bono information, and child support information in accordance with Section 118.2 of the Rules of the Chief Administrator.

If you have any other questions or concerns, please feel free to contact me at your earliest convenience.

Very truly yours,

Martine Charles-Cator
Attorney Registration Unit

MC-C\HB

Page **2** of **2**

EXHIBIT B

UCS-800.2 (Rev.11/1/1999)

3 7634 01-03-2000 9999999
Y AD
50100        1        300.00
        TOTAL:        300.00

NS
**STATE OF NEW YORK**
**OFFICE OF COURT ADMINISTRATION**
**GENERAL POST OFFICE, P.O. BOX 29327**
**NEW YORK, NY 10087-9327**
**212-428-2800**

**7634**

**FORM FOR ATTORNEY REGISTRATION**

To be used only by newly admitted attorneys admitted after January 1, 1986, and to be filed prior to taking the constitutional oath of office.

Section 468-a of the Judiciary Law and the Rules of the Chief Administrator of the Courts call for the biennial registration of all attorneys. As of May 25, 1990, the fee for such registration is $300 (sixty dollars of which shall be deposited in the Lawyers' Fund for Client Protection, and the remainder of which shall be deposited in the Attorney Licensing Fund), except that no fee shall be required from an attorney who certifies that he or she has retired from the practice of law as defined in 22 NYCRR 118.1 (g) (see reverse side).

To register, you must (A) complete this form, (B) sign both the Affirmation of Compliance (if applicable) and the affirmation on the bottom of this page, (C) enclose a check or money order, payable to "NYS Office of Court Administration" (No Cash Please) for $300, and (D) mail to: NYS Office of Court Administration, General Post Office, P.O. Box 29327, New York, NY 10087-9327.
*********************************************************************************************

Affirmation of Compliance required by the Rules of the 1st and 2nd Departments:

I affirm that I have read §1200.46 of the Joint Rules of the Appellate Divisions [DR 9-102 of the Lawyer's Code of Professional Responsibility] and am in compliance therewith, and with §603.15 (1st Dept.) or §691.12 (2nd Dept) of the Rules of the Appellate Division, governing the Conduct of Attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him or her and to maintain certain records relative thereto.

Signature _____        Date _12-27-99_

*********************************************************************************************

(Please complete the following required information --- type or print clearly)

| Attorney's Name | | |
|---|---|---|
| First _Xiaolin_    Middle _____ | | Last _Wang_ |

| Business Address | Home Address |
|---|---|
| Firm _Cleary, Gottlieb, Steen &_ _Hamilton_ | ████████████ |
| Street _2000 Pennsylvania Ave. N.W._ | ████████████ |
| City _Washington_    State _D C_ | Please Note: The home address becomes public information if no business address is provided. |
| Zip Code: _20006_    County of Bus. _____ | |
| Business Telephone: _(202) 974-1564_ | Social Security Number:* ████████ |
| Law School: _Duke University_ _School of Law_ | Date of Birth: ████████ |
| | Anticipated Year of Admission to NYS Bar: _2000_ |
| | NYS Judicial Dept. of Admission: _3rd_ |

I affirm that the statements contained herein are true to the best of my knowledge and belief.

Signature: _____        Date: _12-27-1999_

*********************************************************************************************

*Social Security numbers are required in order to administer the collection of revenue obtained from the Attorney Registration fees. 42U.S.C. §405 (c) (2)(C)(i). Social Security numbers will not be made public.

**EXHIBIT B**

UCS-800.2 (Rev. 11/1999)

**NEW YORK STATE**
**ATTORNEY REGISTRATION FORM**
General Post Office, P.O. Box 29327
N.Y.,N.Y. 10087-9327
212-428-2800
Biennial Registration Period:
2002 - 2003

NOTICE DATE: 06/01/2002

3 2725 08-07-2002 3018629
Y AD
60102    1    300.00
    TOTAL:    300.00

XIAOLIN WANG

2725

| | |
|---|---|
| Attorney Registration Number: 3018629 | |
| **For Official Use Only** | |
| FORM NUMBER: 620294143 | |
| ADDRESS:    HOME | |

Annotate any information that should be corrected or changed below. All name changes must be made with Judicial Dept. of Admission.

| Current Name: | Name When Admitted (if different): |
|---|---|
| XIAOLIN WANG | |
| **Business Address:** | **Home Address (made public if no business address is provided)** |
| CLEARY,GOTTLIE STEEN & HAMILTON *Cadwalader* 2000 PENNSYLVANIA AVE. N.W *Wickersham & Taft* WASHINGTON DC 20006 *100 Maiden Lane* OUT OF STATE COUNTY *New York, NY 10038* | |
| **Business Phone:** | Social Security Number: * |
| (202) 974-1564 *212-504-5681* | |
| Law School: | Date of Birth: |
| DUKE UNIVERSITY SCHOOL OF LAW | Year Admitted to NYS Bar:    2000 |
| | NYS Judicial Dept. of Admission: 3 |

### Affirmations and Certifications (Signatures are required where appropriate)

I affirm that I have read §1200.46 of the Joint Rules of the Appellate Divisions [DR 9-102 of the Lawyer's Code of Professional Responsibility] and am in compliance therewith, and with §603.15 (1st Dept.) or §691.12 (2nd Dept.) of the Rules of the Appellate Division, governing the Conduct of Attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him or her and to maintain certain records relative thereto.

Signature: _____    Date: *7/30/2002*

Retirement Certification (if applicable); I certify that I am retired from the practice of law as defined in 22 NYCRR §118,1 (g) (see reverse side) and therefore am not required to pay the $300 fee.    *N/A*

Signature: _____    Date: _____

### MANDATORY CONTINUING LEGAL EDUCATION:

I certify that I have satisfactorily completed *34* hours (enter #) of continuing legal education for current biennial reporting cycle and that I am in full compliance with the requirements of 22 NYCRR part 1500. I have retained the Certifications of Attendance for the accredited courses and/or programs.

Signature: _____    Date: *7/30/2002*

I certify that I am exempt from the requirements of the Continuing Legal Education Program and (1) have complied with the continuing legal education requirements which I am subject to in another jurisdiction or (2) am not required to comply with continuing legal education requirements in any other jurisdiction.

Signature: _____    Date: _____

I certify that, by the letter dated _____ (fill in), the CLE Board has granted me a waiver from, or an extension until _____, for compliance with the requirements of 22 NYCRR Part 1500 for the current biennial reporting cycle.

Signature: _____    Date: _____

**AN ATTORNEY WHO IS UNABLE TO SIGN ONE OF THE ABOVE THREE CERTIFICATIONS MUST IMMEDIATELY CONTACT THE CONTINUING LEGAL EDUCATION BOARD AT (212) 428 – 2105**

I affirm that the statements contained herein are true to the best of my knowledge and belief.

Signature: _____    Date: *7/30/2002*

**Please make $300 check for the registration fee payable to NYS Office of Court Administration.**

\*    Social security numbers are required in order to administer the collection of revenue obtained from attorney registration fees.
42 U.S.C §405 (c)(2)(C)(i). Social Security numbers will not be made public.

EXHIBIT B

# New York State
# Attorney Registration Form

Office of Court Administration • General Post Office Box 29327 • New York, NY 10087

```
3 5806 07-26-2005 3018629
Y AD
60104      1      350.00
         TOTAL:   350.00
```

## DELINQUENT NOTICE

| BIENNIAL PERIOD | AMOUNT DUE | DUE DATE |
|---|---|---|
| 2004-2005 | $350.00 | July 2004 |
| TOTAL FEES DUE: | $350.00 | |

5806

Attorney Registration Number: 3018629

**For Official Use Only**



830293733

Notice Date: 05/20/2005

Complete all of the applicable information on the front and back of this form and make a copy for your records. DETACH AND RETURN the original with your payment (or certification of retirement) to the Office of Court Administration using the enclosed pre-printed envelope.

**SECTION A:**

## PERSONAL INFORMATION

Review your personal information and make any corrections on the right portion of this page, or check the box to indicate "NO CHANGES OR CORRECTIONS TO PERSONAL INFORMATION"

| PERSONAL INFORMATION | PRINT CHANGES OR CORRECTIONS BELOW |
|---|---|
| **CURRENT NAME:** XIAOLIN WANG | |
| **NAME WHEN ADMITTED (if different):** | |
| **BUSINESS ADDRESS:** CADWALADER WICKERSHAM & TAFT 100 MAIDEN LN NEW YORK, NY 10038-4818 | ~~ABA~~ 12902 Manroe Manor Dr. Oak Hill, VA 20171 |
| **BUSINESS PHONE:** (212) 504-5681 | (202) 246-8132 |
| **HOME ADDRESS (required):** Note: the home address becomes public information if no business address is listed. ██████████████████ | ████████████████ |
| **SOCIAL SECURITY NUMBER:** ████████ Social Security numbers are required in order to administer the collection of revenue from attorney registration fees. 42 U.S.C. § 405(c)(2)(C)(i). Social Security numbers will not be made public. The first 5 digits of your Social Security Number have been concealed to protect your confidentiality. | |
| **DATE OF BIRTH:** ████████ | |
| **LAW SCHOOL:** DUKE UNIVERSITY SCHOOL OF LAW | |
| **YEAR ADMITTED TO NEW YORK BAR:** 2000 | |
| **JUDICIAL DEPT OF ADMISSION:** 3 | |

proceed to next page ➡

☐ **NO CHANGES OR CORRECTIONS TO PERSONAL INFORMATION**

EXHIBIT B          3

**SECTION B:**

## PAYMENT OR CERTIFICATION OF RETIREMENT

You must either: Pay the registration fee (**OPTION 1**) -or- Certify your status as retired from the practice of law and exempt from payment of the registration fee (**OPTION 2**).

### OPTION 1: REGISTRATION FEE ENCLOSED

☑ Check/Money Order payable to: **NYS Office of Court Administration**      Amount $ _350.00_

☐ Credit Card (indicate type):      ☐ MasterCard  -or-  ☐ Visa      **Amount $** _____

Credit Card # ☐☐☐☐ ☐☐☐☐ ☐☐☐☐ ☐☐☐☐      Expiration Date ____ / ____ / ____
                                                                         Month   Day   Year

ZIP Code (of billing address): _____      CVV # (last block of numbers on credit card signature strip): _____

Name on card (please print): _____      Signature: _____

### OPTION 2: CERTIFICATION OF RETIREMENT

I certify that I am retired from the practice of law as defined in 22 NYCRR §118.1 (g) and therefore am not required to pay the fee.

Signature: _____      Date: _____

**SECTION C:**

## MANDATORY CONTINUING LEGAL EDUCATION

You must sign one of the following certifications:

I certify that I have completed _24_ CLE credit hours in the current biennial reporting cycle. I also have _____ carryover credits from the prior reporting cycle. I am in full compliance with the requirements of the New York State CLE Program (22 NYCRR 1500) and have retained documentation of my compliance.

Signature: _____      Date: _7/22/05_

I certify that under 22 NYCRR 1500.5(b), I am exempt from the requirements of the New York State CLE Program for the current biennial reporting cycle **and either** (1) I have complied with the continuing legal education requirements to which I am subject in another jurisdiction, or (2) I am not required to comply with continuing legal education requirements in any other jurisdiction.

Signature: _____      Date: _____

I certify that I (circle one) **applied for / was granted** a (circle one) **waiver / modification / extension** from the CLE Board on (date) _____.

Signature: _____      Date: _____

22 NYCRR 1500 and additional information on the CLE program may be found at www.nycourts.gov/attorneys/cle.

**IF YOU ARE UNABLE TO SIGN ANY OF THE ABOVE CERTIFICATIONS, CONTACT THE CLE OFFICE AT (212) 428-2105.**

If you were on active military duty during the biennial registration period, please contact the CLE office.

**SECTION D:**

## AFFIRMATION OF COMPLIANCE WITH §1200.46 (DR 9-102)

(For attorneys whose practice falls within the First or Second Departments)

In accordance with §603.15 (1st Dept.) or §691.12 (2nd Dept.) of the Rules of the Appellate Division, I affirm that I have read, and am in compliance with, §1200.46 of the Joint Rules of the Appellate Divisions [DR 9-102 of the Lawyer's Code of Professional Responsibility], governing the conduct of attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him or her and to maintain certain records relative thereto.

Signature: _____      Date: _7/22/05_

**SECTION E:**

## VERIFICATION

I affirm that the statements contained herein are true to the best of my knowledge and belief.

Signature: _____      Date: _7/22/05_

Complete all of the applicable information on the front and back of this form and make a copy for your records. DETACH AND RETURN the original with your payment (or certification of retirement) to the Office of Court Administration using the enclosed pre-printed envelope.

4      For additional information visit our website: www.nycourts.gov • (212) 428-2800 • E-mail: attyreg@courts.state.ny.us

Detach and return

EXHIBIT B

 **NEW YORK STATE OFFICE OF COURT ADMINISTRATION**
Attorney Registration Unit, General Post Office Box 29327
New York, NY 10087-9327 (212) 428-2800

3 5787 11-09-2007 3018629
N AD
60106       1       350.00
TOTAL:       350.00

## DELINQUENT NOTICE

| BIENNIAL PERIOD | AMOUNT DUE | DUE DATE |
|---|---|---|
| 2006-2007 | $350.00 | July 2006 |

5787

| Attorney Registration Number: 3018629 |
|---|
| Notice Date: 10/12/2007 |

Complete all of the applicable information on the FRONT
and BACK of this form and make a copy for your records.
Return the original with your payment
(or certification of retirement) to the Office of Court
Administration, Attorney Registration Unit, General Post Office Box
29327, New York, NY 10087-9327.

**TOTAL FEES DUE:       $350.00**

### SECTION A:

Review your personal information and make any corrections on the right portion of this page, or check the box to indicate
"NO CHANGES OR CORRECTIONS TO PERSONAL INFORMATION"

| PERSONAL INFORMATION | PRINT CHANGES OR CORRECTIONS BELOW |
|---|---|
| **CURRENT NAME:**<br>XIAOLIN  WANG | |
| **NAME WHEN ADMITTED (if different):** | |
| **BUSINESS ADDRESS :**<br>CADWALADER WICKERSHAM & TAFT<br>12902 MONROE MANOR DRIVE<br>OAK HILL, VA 20171<br>UNITED STATES | *American Compass Inc.*<br>*55 S. Lake Ave.*<br>*Suite 630*<br>*Pasadena, CA 91101* |
| **BUSINESS PHONE :**<br>(202) 246-8132 | *(626) 683-9120* |
| **HOME ADDRESS (required):**<br>Note: the home address becomes public information if no business address is listed. | ▉ |
| **SOCIAL SECURITY NUMBER:** ▉<br>* SOCIAL SECURITY NUMBERS ARE REQUIRED IN ORDER TO ADMINISTER THE COLLECTION OF<br>REVENUE FROM ATTORNEY REGISTRATION FEES.  42 U.S.C. § 402(c) (2) (C) (i)  SOCIAL SECURITY<br>NUMBERS WILL NOT BE MADE PUBLIC. | ▉ |
| **DATE OF BIRTH:** ▉ | |
| **LAW SCHOOL:**<br>DUKE UNIVERSITY SCHOOL OF LAW | |
| **YEAR ADMITTED TO NEW YORK BAR:**       2000 | |
| **JUDICIAL DEPT OF ADMISSION:**       3 | |

☐ **NO CHANGES OR CORRECTIONS TO PERSONAL INFORMATION**

Proceed to Next page.

EXHIBIT B

**SECTION B:**

## PAYMENT OR CERTIFICATION OF RETIREMENT

You must either: Pay the registration fee **(OPTION 1)** -or- Certify your status as retired from the practice of law and exempt from payment of the registration fee **(OPTION 2)**.

**OPTION 1: REGISTRATION FEE ENCLOSED**

☐ Check/Money Order payable to: **NYS Office of Court Administration**      Amount $ _____

☑ Credit Card (indicate type):        ☐ MasterCard   -or-  ☑ Visa      Amount $ 350.00

Credit Card # ██████████████████████████      Expiration Date ███████
                                                                Month / Year

ZIP Code (of billing address): ███████      CV\ # (last block of numbers on credit card signature strip): ███████

Name on card (please print): Xiaolin Wang        ✍ Signature: _~Wang Xiaolin~_

**OPTION 2: CERTIFICATION OF RETIREMENT**

I certify that I am retired from the practice of law as defined in 22 NYCRR §118.1 (g) and therefore am not required to pay the fee.

✍ Signature: _____      Date: _____

**SECTION C:**

## MANDATORY CONTINUING LEGAL EDUCATION

You must sign one of the following certifications:

I certify that I have completed _____ CLE credit hours in the current biennial reporting cycle. I also have _____ carryover credits from the prior reporting cycle. I am in full compliance with the requirements of the New York State CLE Program (22 NYCRR 1500) and have retained documentation of my compliance.

✍ Signature: _____      Date: _____

I certify that under 22 NYCRR 1500.5(b), I am exempt from the requirements of the New York State CLE Program for the current biennial reporting cycle **and either** (1) I have complied with the continuing legal education requirements to which I am subject in another jurisdiction, or (2) I am not required to comply with continuing legal education requirements in any other jurisdiction.

✍ Signature: _~Wang Xiaolin~_____      Date: 11/02/2007

I certify that I (circle one) **applied for / was granted** a (circle one) **waiver / modification / extension** from the CLE Board on (date) _____

✍ Signature: _____      Date: _____

22 NYCRR 1500 and additional information on the CLE program may be found at www.nycourts.gov/attorneys/cle.

**IF YOU ARE UNABLE TO SIGN ANY OF THE ABOVE CERTIFICATIONS, CONTACT THE CLE OFFICE AT (212) 428-2105.**

If you were on active military duty during the biennial registration period, please contact the CLE office.

**SECTION D:**

## AFFIRMATION OF COMPLIANCE WITH §1200.46 (DR 9-102)

(For attorneys whose practice falls within the First or Second Departments)

In accordance with §603.15 (1st Dept.) or §691.12 (2nd Dept.) of the Rules of the Appellate Division, I affirm that I have read, and am in compliance with, §1200.46 of the Joint Rules of the Appellate Divisions [DR 9-102 of the Lawyer's Code of Professional Responsibility], governing the conduct of attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him or her and to maintain certain records relative thereto.

✍ Signature: _____      Date: _____

**SECTION E:**

## VERIFICATION

I affirm that the statements contained herein are true to the best of my knowledge and belief.

✍ Signature: _~Wang Xiaolin~_____      Date: 11/02/2007

Complete all of the applicable information on the front and back of this form and make a copy for your records. DETACH AND RETURN the original with your payment (or certification of retirement) to the Office of Court Administration using the enclosed pre-printed envelope.

For additional information visit our website: www.nycourts.gov • (212) 428-2800 • E-mail: attyreg@courts.state.ny.us

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629   **Batch #:** Online   **Process Date:** 12/22/2011   **Receipt #:** 125357
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2008-2009**

**Payment Information:**
Fee: Current   $350   Credit Card(last 4) ███████

## PERSONAL INFORMATION

**Current Name:**
First:   XIAOLIN
Middle:
Last:   WANG

**Business Address:**
WM GreenTech Automotive Corp.
1650 Tysons Blvd Ste 810
McLean, VA 22102-4844

**Country:** United States of America
**County:**
**Business Phone:** (703) 666-9001 ext. 102
**e-mail Address** (optional):
(Note: If provided, the e-mail address will be made public.)

**Home Address:**
(Note: The Home Address is public information ONLY if no business is provided.)

███████████████████████

**County:**

**Social Security Number** ████████   **Date of Birth:** ████████
**Year Admitted to NYS Bar:** 2000   **Judicial Dept. of Admission:** 3
**Law School:** DUKE UNIVERSITY SCHOOL OF LAW

## OTHER REPORTS & CERTIFICATIONS:

**Mandatory Continuing Legal Education (22 NYCRR §1500):**
EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...

**Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
███████████████████████

**Report of Pro Bono Services Part 1200 (Rule 6.1):**
███████████████████████

**Affirmation Of Compliance With Part 1200 (Rule 1.15):**
Multiple registrations filed simultaneously - see 2010-2011 biennial period reporting summary.

**ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT**
███████████████████████

**VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
Verification Signature: Yes Date: 12/22/2011

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629    **Batch #:** Online    **Process Date:** 12/22/2011    **Receipt #:** 125357
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2010-2011**

**Payment Information:**
Fee: Current  $350  Credit Card(last 4) ███

## PERSONAL INFORMATION
**Current Name:**
First:  XIAOLIN
Middle:
Last:  WANG

**Business Address:**
WM GreenTech Automotive Corp.
1650 Tysons Blvd Ste 810
McLean, VA 22102-4844

**Country:** United States of America
**County:**
**Business Phone:** (703) 666-9001 ext. 102
**e-mail Address**(optional):
(Note: If provided, the e-mail address will be made public.)

**Home Address:**
(Note: The Home Address is public information ONLY if no business is provided.)
███████████████████████████

**County:**

**Social Security Number** █████████    **Date of Birth:** ████████
**Year Admitted to NYS Bar:** 2000    **Judicial Dept. of Admission:** 3
**Law School:** DUKE UNIVERSITY SCHOOL OF LAW

## OTHER REPORTS & CERTIFICATIONS:

**Mandatory Continuing Legal Education (22 NYCRR §1500):**
EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...
**Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
███████████████████████████████

**Report of Pro Bono Services Part 1200 (Rule 6.1):**
███████████████████████████████

**Affirmation Of Compliance With Part 1200 (Rule 1.15):**
Affirmation Signature: Yes

**ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT**

**VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
Verification Signature: Yes Date: 12/22/2011

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629    **Batch #:** Online    **Process Date:** 06/27/2012    **Receipt #:** 144396
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2012-2013**

**Payment Information:**
Fee: Current   $375   Credit Card(last 4) ████

## PERSONAL INFORMATION

**Current Name:**
First:   XIAOLIN
Middle:
Last:   WANG

**Business Address:**
WM GreenTech Automotive Corp.
1650 Tysons Blvd Ste 810
McLean, VA 22102-4844

**Country:** United States of America
**County:**
**Business Phone:** (703) 666-9001 ext. 102
**e-mail Address**(optional):
(Note: If provided, the e-mail address will be made public.)

**Home Address:**
(Note: The Home Address is public information ONLY if no business is provided.)

████████████████████████████

**County:**

**Social Security Number** ████████    **Date of Birth** ████████
**Year Admitted to NYS Bar:** 2000    **Judicial Dept. of Admission:** 3
**Law School:** DUKE UNIVERSITY SCHOOL OF LAW

## OTHER REPORTS & CERTIFICATIONS:

**Mandatory Continuing Legal Education (22 NYCRR §1500):**
EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...

**Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
████████████████████████████

**Report of Pro Bono Services Part 1200 (Rule 6.1):**
████████████████████████████

**Affirmation Of Compliance With Part 1200 (Rule 1.15):**
Affirmation Signature: Not on Record.

### ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT

**VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
Verification Signature: Yes Date: 06/27/2012

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629     **Batch #:** Online     **Process Date:** 06/02/2014     **Receipt #:** 237552
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2014-2015**

**Payment Information:**
  Fee: Current    $375    Credit Card(last 4) ▉▉▉

## PERSONAL INFORMATION
  **Current Name:**
  First:    XIAOLIN
  Middle:
  Last:    WANG

  **Business Address:**
  WM GreenTech Automotive Corp.
  1600 Tysons Blvd Ste 1150
  McLean, VA 22102-4883

  **Country:** United States of America
  **County:**
  **Business Phone:** (703) 666-9001 ext. 102
  **e-mail Address** (optional):
    (Note: If provided, the e-mail address will be made public.)

**Home Address:**
  (Note: The Home Address is public information ONLY if no business is provided.)

  ▉▉▉▉▉▉▉▉▉▉▉▉

  **County:**

  **Social Security Number:** ▉▉▉▉▉     **Date of Birth:** ▉▉▉▉
  **Year Admitted to NYS Bar:** 2000     **Judicial Dept. of Admission:** 3
  **Law School:** DUKE UNIVERSITY SCHOOL OF LAW

## OTHER REPORTS & CERTIFICATIONS:

**Mandatory Continuing Legal Education (22 NYCRR §1500):**
  EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...
**Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
  ▉▉▉▉▉▉▉▉▉▉▉▉

**Report of Pro Bono Services Part 1200 (Rule 6.1):**
  ▉▉▉▉▉▉▉▉▉▉▉▉

**Affirmation Of Compliance With Part 1200 (Rule 1.15):**
  Affirmation Signature: Not on Record.

### ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT

**VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
  Verification Signature: Yes Date: 06/02/2014

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629    **Batch #:** Online    **Process Date:** 05/23/2023    **Receipt #:** 203927
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2016-2017**

**Payment Information:**
Fee: Current   $375   Credit Card(last 4) ███

## PERSONAL INFORMATION
**Current Name:**
First:   XIAOLIN
Middle:
Last:   WANG

**Business Address      (GEOCODED):**
SALEEN MOTORS INT'L
1361 HARDISON LN
MCLEAN, VA 22102-2241

**Country:** UNITED STATES OF AMERICA
**County:**
**Business Phone:** (202) 676-6189
**e-mail Address**(optional): wangxcharlie@gmail.com
(Note: If provided, the e-mail address will be made public.)

**Home Address      (GEOCODED):**
(Note: The Home Address is public information ONLY if no business is provided.)

███████████████████████████

**County:**

**Social Security Number:** ███████    **Date of Birth:** ███████
**Year Admitted to NYS Bar:** 2000    **Judicial Dept. of Admission:** 3
**Law School:** Duke University School of Law

## OTHER REPORTS & CERTIFICATIONS:
**Mandatory Continuing Legal Education (22 NYCRR §1500):**
EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...
**Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
███████████████████████████

**Report of Pro Bono Services Part 1200 (Rule 6.1):**
███████████████████████████

**Affirmation Of Compliance With Part 1200 (Rule 1.15):**
Multiple registrations filed simultaneously - see 2022-2023 biennial period reporting summary.

**ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT**
███████████████████████████

**VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
Verification Signature: Yes Date: 05/23/2023

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629      **Batch #:** Online      **Process Date:** 05/23/2023      **Receipt #:** 203927
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2018-2019**

**Payment Information:**
  Fee: Current   $375   Credit Card(last 4) ▮▮▮▮

## PERSONAL INFORMATION
  **Current Name:**
  First:   XIAOLIN
  Middle:
  Last:   WANG

  **Business Address      (GEOCODED):**
  SALEEN MOTORS INT'L
  1361 HARDISON LN
  MCLEAN, VA 22102-2241

  **Country:** UNITED STATES OF AMERICA
  **County:**
  **Business Phone:** (202) 676-6189
  **e-mail Address** (optional): wangxcharlie@gmail.com
    (Note: If provided, the e-mail address will be made public.)

  **Home Address      (GEOCODED):**
    (Note: The Home Address is public information ONLY if no business is provided.)
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  **County:**
  **Social Security Number:** ▮▮▮▮▮▮      **Date of Birth:** ▮▮▮▮▮
  **Year Admitted to NYS Bar:** 2000      **Judicial Dept. of Admission:** 3
  **Law School:** Duke University School of Law

## OTHER REPORTS & CERTIFICATIONS:

  **Mandatory Continuing Legal Education (22 NYCRR §1500):**
    EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...
  **Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  **Report of Pro Bono Services Part 1200 (Rule 6.1):**
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  **Affirmation Of Compliance With Part 1200 (Rule 1.15):**
    Multiple registrations filed simultaneously - see 2022-2023 biennial period reporting summary.

  **ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT**
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  **VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
  Verification Signature: Yes Date: 05/23/2023

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629    **Batch #:** Online    **Process Date:** 05/23/2023    **Receipt #:** 203927
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2020-2021**

**Payment Information:**
Fee: Current   $375   Credit Card(last 4) ███

## PERSONAL INFORMATION
**Current Name:**
First:   XIAOLIN
Middle:
Last:   WANG

**Business Address      (GEOCODED):**
SALEEN MOTORS INT'L
1361 HARDISON LN
MCLEAN, VA 22102-2241

**Country:** UNITED STATES OF AMERICA
**County:**
**Business Phone:** (202) 676-6189
**e-mail Address**(optional): wangxcharlie@gmail.com
(Note: If provided, the e-mail address will be made public.)

**Home Address     (GEOCODED):**
(Note: The Home Address is public information ONLY if no business is provided.)

███████████████████████████

**County:**
**Social Security Number:** ███████    **Date of Birth:** ███████
**Year Admitted to NYS Bar:** 2000    **Judicial Dept. of Admission:** 3
**Law School:** Duke University School of Law

## OTHER REPORTS & CERTIFICATIONS:

**Mandatory Continuing Legal Education (22 NYCRR §1500):**
EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...

**Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
███████████████████████████

**Report of Pro Bono Services Part 1200 (Rule 6.1):**
███████████████████████████

**Affirmation Of Compliance With Part 1200 (Rule 1.15):**
Multiple registrations filed simultaneously - see 2022-2023 biennial period reporting summary.

**ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT**
███████████████████████████

**VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
Verification Signature: Yes Date: 05/23/2023

EXHIBIT B

**New York State**
**Confidential Attorney Registration Record**
*Filed Pursuant Judiciary Law §468-a and 22 NYCRR 118*
**FOR OFFICIAL USE ONLY**
Office of Court Administration

Print Date: February 09, 2026
Page 1 of 1

**Attorney Registration #:** 3018629     **Batch #:** Online     **Process Date:** 05/23/2023     **Receipt #:** 203927
**Name:** XIAOLIN WANG

**Biennial Registration Period: 2022-2023**

**Payment Information:**
  Fee: Current   $375   Credit Card(last 4) ███████

**PERSONAL INFORMATION**
  **Current Name:**
  First:   XIAOLIN
  Middle:
  Last:   WANG

  **Business Address     (GEOCODED):**
  SALEEN MOTORS INT'L
  1361 HARDISON LN
  MCLEAN, VA 22102-2241

  **Country:** UNITED STATES OF AMERICA
  **County:**
  **Business Phone:** (202) 676-6189
  **e-mail Address** (optional): wangxcharlie@gmail.com
    (Note: If provided, the e-mail address will be made public.)

**Home Address     (GEOCODED):**
  (Note: The Home Address is public information ONLY if no business is provided.)

███████████████████████████████████

  **County:**
  **Social Security Number:** ████████     **Date of Birth:** ████████
  **Year Admitted to NYS Bar:** 2000     **Judicial Dept. of Admission:** 3
  **Law School:** Duke University School of Law

**OTHER REPORTS & CERTIFICATIONS:**

  **Mandatory Continuing Legal Education (22 NYCRR §1500):**
    EXEMPT FROM CLE CREDIT REQUIREMENTS: I certify that I am exempt from CLE requirements...
  **Compliance With Child Support Obligations (Gen. Oblig. L. §3-503):**
  ████████████████████████████████████

  **Report of Pro Bono Services Part 1200 (Rule 6.1):**
  ████████████████████████████████████

  **Affirmation Of Compliance With Part 1200 (Rule 1.15):**
  Affirmation Signature: Not on Record.

  **ADMISSION TO PRACTICE LAW IN OTHER JURISDICTIONS AND DISCIPLINE REPORT**

  **VERIFICATION** I affirm that the statements contained herein are true to the best of my knowledge and belief.
  Verification Signature: Yes Date: 05/23/2023

EXHIBIT B

Login | Watch TV

**Recommended Videos**

CHINA **Published** August 8, 2020 9:50am EDT

# China wields coronavirus to nationalize American-owned carmaker

Police and private security forces raided the headquarters on June 29

Add Fox Business on Google

By Jonathan Garber | **FOXBusiness**

China enticed an American entrepreneur with the opportunity of helping build a cutting-edge automobile company in the world's largest car market, then used the uncertainty cast by COVID-19 to steal his intellectual property, the businessman says.

Steve Saleen, founder of specialty high-performance sports car manufacturer Saleen Automotive, and his partner Charles Wang, a Chinese immigrant and former attorney at a New York law firm, were approached in late 2015 about forming a joint venture with the city of Rugao to manufacture automobiles.

The deal "offered, I thought, from my standpoint, a great opportunity to help build a global company," Saleen told FOX Business.

The agreement that was reached called for Saleen to contribute his brand and trademarks, designs for three engineered vehicles and experience, know-how and technology in manufacturing automobiles, he said. Those contributions were valued at $800 million.

Wang, who helped structure the deal, would serve as the company's chief executive officer.

EXHIBIT C

## $1.6T IN CENTURY-OLD CHINESE BONDS OFFER TRUMP UNIQUE LEVERAGE AGAINST BEIJING

For their efforts, Saleen, Wang and their partners would receive two-thirds ownership of the newly formed company called Jiangsu Saleen Automotive Technologies.

The city of Rugao's government, which owned the remaining third, was responsible for providing $500 million of capital and $600 million in subsidized loans over three years to fund the operations and build a manufacturing facility. Rugao, located on China's Eastern seaboard in Jiangsu province, is about 125 miles north of Shanghai.

"It sounded like a great deal to us, so we went along with them," Wang said, adding that his experience enabled him to set up the company's corporate governance and articles of incorporation in accordance with Chinese law.

By early 2020, everything was going according to plan. The initial product, an SUV, was in certification and the employee headcount had swelled from three to nearly 1,000. The factory, armed with 470 state-of-the-art robots, was ready for production.

Then the COVID-19 pandemic struck.

With both Saleen and Wang stuck in the U.S. as flights to China were grounded, the Rugao government seized on an opportunity to "nationalize the company," according to Saleen.

## US WILL PAY FOR COMPANIES TO BRING SUPPLY CHAINS HOME FROM CHINA: KUDLOW

On June 29, the city sent six police cars with sirens blaring and vans full of private security forces to raid Jiangsu Saleen's manufacturing facility and offices.

The forces ordered employees to leave and shut off the water and electricity when some refused to do so. Executives, who were Chinese nationals were forced to resign or

EXHIBIT C

face consequences from Rugao's government, Saleen told FOX Business. The remaining employees were terminated.

Saleen Automotive Inc.

---

Two employees, Frank Sterzer, a German national who was vice president of manufacturing, and Grace Yin Xu, a Chinese national in charge of corporate affairs, were detained.

While Sterzer was released after six hours when he contacted the German Embassy with a cellphone that wasn't confiscated, Yin Xu was held for a month after she refused to corroborate the local government's claims that Wang tried to embezzle money.

Rugao authorities also claimed Saleen's technology was worthless and false information was given to secure a higher valuation, he told FOX Business.

Without Saleen's knowledge, officials had previously filed 510 patents for the intellectual properties he developed – 120 of which were already awarded, including his signature supercharger. Many of the filings didn't even list Saleen as the inventor.

The shareholder who represented the city's one-third stake held an illegal board meeting and removed Saleen and Wang as directors of the firm, leaving the foreign shareholders without representation, he said. Under Chinese corporate law, a board meeting cannot be held without a quorum of 51 percent of shareholders.

Saleen Automotive Inc.

---

The Rugao government didn't comment when reached by FOX Business. Efforts to obtain comment from China's Ministry of Foreign Affairs, located in Beijing, were unsuccessful, and a spokesperson from the U.S. Commerce Department didn't respond to a request from FOX Business.

EXHIBIT C

While chances are slim for a resolution on the mainland, Saleen and Wang have an avenue for arbitration in Hong Kong. Their attorney in the special administrative region said there is a good chance they will win the case, but whether it will be enforceable is "a huge question mark," according to Wang.

## CHINA'S PURCHASES IN TRUMP TRADE DEAL MISSING TARGET

The irony is that as Saleen's company was being taken over, the U.S. and China were putting the finishing touches on a phase one trade deal for which President Trump had been pushing since taking office.

The initial agreement included promises from Beijing to halt intellectual property theft, and a second phase -- now in limbo as tensions between the two countries mount -- was supposed to hone in on those commitments.

Should it come about despite Trump's criticism of China's handling of COVID-19, a highly contagious disease first observed in the country late last year, and its crackdown on civil liberties in Hong Kong, Saleen has some ideas of what it should include.

He says Chinese firms that infringe on intellectual property should be blocked from U.S. capital markets, asset valuations by Chinese companies that operate in the U.S. should be prohibited and that entities and individuals should be held accountable for any intellectual property infringement with both civil and criminal liability.

He also believes Chinese cars should be blocked from the U.S. market unless they are part of a joint venture with an American company.

## CLICK HERE TO READ MORE ON FOX BUSINESS

Saleen, who worries it is "too late" for him and his partners, thinks his experience serves as a warning for anyone who is thinking about doing business in China.

EXHIBIT C

"If it can happen to me, it can literally happen to anyone," Saleen said. "If this wasn't happening in real-time, you would think that it was actually a Hollywood movie."

Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions.  Legal Statement.

This material may not be published, broadcast, rewritten, or redistributed. ©2026 FOX News Network, LLC. All rights reserved. FAQ - New Privacy Policy

EXHIBIT C

# Stalled in the pits, Saleen China heads for the scrap heap

**With only seven cars sold this year and a CEO on the lam, Saleen China is parked up on the emergency lane, waiting to be towed away.**

22:15 Jul 04, 2020



By HOU Zhuokai

Translated by GU Yiwei

As we tried to get into Saleen's premises on the Bund in Shanghai, the security guard shouted: "No point knocking! The company's bankrupt! Everyone is gone!"

Launched with much pomp and spectacle in November 2019, the showroom claimed to offer an immersive experience into legendary race-cars and supercars. It is now a dark and empty testament to a deal that looked strange from the beginning.  A Saleen Maimai, a new model much mocked for its cartoonish appearance, remained on stage.

No Saleen employee was to be found. A cleaning record showed that the showroom has been closed since June 23. Open for only eight months, the showroom was the shortest-lived tenant at the most prestigious address in Shanghai. The building manager said the showroom had been seized by the district court. "Everything needs to be out by the end of July."

EXHIBIT D

We went to Saleen's headquarters in Jing'an District. It was around noon and people were pouring out of the buildings for lunch. The sprawling campus is divided into two, one for exhibits and the other for offices. There are seizure notices at every entrance.  When asked if they worked for the company, passersby either demurred politely or simply walked away. A small group was overhead discussing resignation and job hunts.



Saleen's headquarters in Jing'an District.

Jiangsu Saleen Automotive Technology rose to fame on the back of flamboyant publicity stunts and is now deep in trouble. After the Maimai tanked last year, allegations of fraud arose and ravenous creditors circled. In May, after the company's former lawyer exposed the business's murky technology, ownership and financing, bank accounts were frozen, leaving hundreds of workers unpaid. The trouble, however, started well before that.

## My, my! A golf cart!

"I have to leave. I have to survive."

Xiao Yue recently left Saleen. She said the company stopped paying benefits in February when the COVID-19 outbreak started, and in May all salaries went unpaid. Now the landlord has issued an eviction notice telling JSAT to move out by July 15.

"I gave up three other job offers to work here, just last year! I thought, wow, cutting-edge technology! Deep pockets! Who would have thought?"

She was not the only mug. JSAT was formed in 2016 when Jiangsu Secco threw a lifeline to financially beleaguered Saleen. Jiangsu Secco owns a third of JSAT's shares, with the rest owned by a handful of entities controlled by Charles Xiaolin Wang, chairman and CEO of JSAT.

EXHIBIT D



Charles Xiaolin Wang, chairman and CEO of JSAT.

Government incentives and enormous capital injections allowed the new company to almost immediately invest 17.8 billion yuan (US$2.5 billion) in a "world-class" factory. Soon after, JSAT acquired 4 billion yuan and invested in a "slightly smaller" factory nearby.

When the Shanghai campus opened in early 2019, local job boards were flooded with JSAT posts. The pay was good, even for non-tech positions. "The benefits were the same as other rising tech companies. The salaries for some hot positions were even twice or three times higher." Xiao Yue said. "Some of my ex-coworkers even quit their jobs at other car companies to join."

In the year that followed, JSAT spent heavily on wasteful headline-making events. High-profile fanfares such as the Shanghai showroom and the grand launch ceremony at the Bird's Nest stadium in Beijing, all felt reassuring. The company was getting attention, although not always in a good way.

JSAT debuted five models, including an SUV that was intended to compete against the Porsche Macan. What drew the most attention was an electric vehicle called the Saleen MaiMai. The company touted it as an "urban vehicle with the genes of a race-car", claiming that the design was conceived by Giorgetto Giugiaro — "Legendary car designer who created many classic models of Ferrari and Maserati"— and that Steve Saleen, the mastermind behind the brand had "fine-tuned its engine and electric system himself."

"The company had high expectations for the MaiMai." Xiao Yue said. Priced at about 160,000 yuan, it's almost twice as expensive as mature models of other electric urban vehicles sold in China.  Almost a year after its debut, a total of 27 MaiMais had been sold, only 7 in 2020.

MaiMai, as it turned out, is a revamped version of Mycar, a tiny two-seater electric low-speed vehicle (LSV) designed for congested urban settings. Often dubbed "golf carts", it wasn't well received when it was first launched around 2010, and the technology was soon acquired by Charles Wang from its Hong Kong based developers for US$20 million.

When the revamped version was unveiled ten years later, it was met with mockery and disbelief. "What a naive design!" one car critic commented. Even the security guards couldn't stop smirking.

EXHIBIT D



Saleen Maimai, a revamped version of a tiny two-seater electric low-speed vehicle but debuted by JSAT in 2019. By far, only 27 Maimais have been sold.

Charles Wang, however, remained steady. "Automakers must meet the needs of the new era, starting from body designs," Wang said.

Xiao Yue said that two other models were supposed to hit the market later this year. "The boss flew to America a few times last year to find suppliers and plan for production. To my knowledge, it's pretty much all set over there."

## Talking the talk

A prototype of the Saleen Mac is on display on the Shanghai Campus and looks almost ready for production. Our investigation found that contrary to JSAT's claim that the Saleen MAC was "independently developed with proprietary race-car technology," only the electric system and body design come from in-house teams. Qiao Yudong, JSAT's former legal counsel, recently denounced the company for defrauding investors and the government of millions of dollars. He also questioned the ownership structure — four entities controlled by Wang owns two-thirds of JSAT shares — calling the company a money-swindling scheme.

"Wang is very smart and very socially versatile," a former employee said. "But above all these, he is an extremely good storyteller. That's maybe why he is where he is today."

At least he has told a good story about himself. His social media profiles are laden with titles, honors, and hyperboles such as "top Wall Street attorney" and "Chinese-American business leader." Despite the publicity, very little is known about his background. In fact, no one is sure of his whereabouts either. In an interview in May, he told a domestic media outlet that he had been working on certification for Saleen's new models and will remain in the US indefinitely.

JSAT employees have given up all hope. The scorched financial earth he left behind is not going away. Jiangsu Secco said on June 30 that the company will take steps to pay salaries and benefits for those who agree to resign. Those who refused to resign have the option of working from the nearby secondary campus, but it also has overdue rent and the company could be evicted at any time.

"Jiangsu Secco will make every effort to protect the rights of JSAT's employees," a company statement said. "Beyond backpay, the company is not able to make any further promises."

EXHIBIT D

For the employees who have been on an emotional and financial rollercoaster, there isn't much to ask for. Nantong Jiahe Chemical, the only state-owned shareholder of JSAT, has called the police after finding "evidence supporting the allegation of Wang's falsification of supporting documents, and embezzlement."

In response, Wang said on WeChat on July 3 that he had gone "back to my good old business as a lawyer and a law professor."

Three days ago, he sent an internal memo to employees, saying that the drastic collapse of the company was persecution, plotted by Jiahe and some local officials, but named no one.

The memo said nothing about when he would return.

(Xiao Yue is an assumed name)

**ABOUT JIEMIAN**

**FOLLOW**

About Us    Terms Of Use    Contact Us    Contribute    Privacy Policy

Copyright © 2014~2019 JIEMIAN.COM All Rights Reserved.

EXHIBIT D

# Fraud charges, lost patents: How an L.A. auto legend's China venture crashed

Shashank Bengali
August 13, 2020 • 10 min read

 



An S1 sports car is parked at the entrance to the Jiangsu Saleen auto plant in Rugao, China. (Saleen Automotive Inc.)

In July 2019, Steve Saleen, the Southern California designer of souped-up Ford Mustangs and eponymous supercars, walked onto a strobe-lighted stage at Beijing National Stadium to launch a new line of vehicles for the Chinese market.

During a 90-minute spectacle featuring techno beats, mesh-clad dancers and an appearance by the British action star Jason Statham, Saleen introduced himself as an automotive legend whose partnership with Chinese state investors would inject "supercar DNA" into high-end sedans, coupes and an SUV aimed at younger drivers.

EXHIBIT E

A year later, that flashy vision has veered disastrously off track.

Saleen's Chinese backers have accused his business partner of fraud and embezzlement and taken over the company, freezing its accounts and forcing hundreds of employees out of work. Police raided the sprawling new factory emblazoned with Saleen's name. Two senior executives were detained, and a court order sealed its Shanghai showroom.

Saleen alleges the Chinese shareholders planned to steal his intellectual property and have filed for more than 500 Chinese patents for his designs and technology. Stories in China's government-owned media offer a different account — one of a flailing startup that squandered public funds on the launch while its first vehicle flopped, and whose technology was worth far less than the state shareholders had been led to believe.

The story of Saleen's joint venture with the government of the eastern city of Rugao began with yet another American entrepreneur wading into China with dreams of building a lucrative global business.



That promise foundered on miscalculations, suspicions and the inexperience of a sports car guru who knew more about engine tuning than financial maneuverings. Saleen says he's become

EXHIBIT E

a cautionary tale about dealing with China, where the alleged theft of foreign companies' trade secrets Case 4:25-cv-00931-O Document 73-3 Filed 06/16/26 Page 48 of 76 PageID 1063 offered grist for the Trump administration's deepening cold war with Beijing.

"What I'm trying to do is to bring to light how American companies will contribute IP, brands and knowhow to the China market — and overnight they will change direction, kick you out and keep the IP," Saleen said.

The dispute could go to arbitration in Hong Kong, where Saleen's business partner — Chinese-born U.S. resident Charles Xiaolin Wang, who was investigated years earlier by U.S. authorities — has sued the Rugao government for breach of the joint venture agreement. In an interview, Wang denied the fraud allegations.

Whatever the outcome, Saleen's bid to bring his high-powered cars to China has crashed, leaving the 71-year-old filled with regret.

"When it came to taking my brand on a global basis, it really seemed to offer me an opportunity that I could not refuse," Saleen said. "In hindsight I realize the deal was too good to be true."



Steve Saleen in 2003 at his Irvine plant with the Saleen S7. (Karen Tapia-Andersen / Los Angeles Times)

The Inglewood-born Saleen, who raced Ford Mustangs competitively in the 1970s and 1980s, made his name as a master modifier of the iconic American muscle car. Fitted with superior engines, suspensions and transmissions at his plant in Irvine, Saleen's customized Mustangs frequently bested Porsche and Ferrari on the track and cost far less, putting high-performance race cars within reach of American enthusiasts.

EXHIBIT E

In 2000 he debuted the S7 — a low, sinuous two-seater with wing-like doors, designed and built from the ground up — which went from 0 to 60 in 2.8 seconds and soon became one of the world's premier supercars.

His roster of celebrity clients grew to include Tom Cruise and Derek Jeter, but some dealers and contractors began to complain about missed deliveries and bounced checks. In September 2014, Saleen Automotive reported to the SEC that it had just $7,261 cash on hand and owed more than $5.6 million to suppliers, banks and the IRS, raising "substantial doubt" that it could stay afloat.

A potential lifeline emerged in 2015 with a visit to Saleen's factory in Corona by a delegation from Rugao, a city of 1.4 million built on farmland in the Yangtze River delta, two hours north of Shanghai. Officials told Saleen they dreamed of building "a mini-Detroit" and were looking for a big-name auto company to come in and create jobs.

The dealmaker was Wang, a Duke-educated lawyer and businessman with connections in China but a checkered history.

Federal regulators had investigated Wang's earlier auto venture — an electric car company called GreenTech that was also backed by former Virginia Gov. Terry McAuliffe — for alleged

EXHIBIT E

[abuse](#) of a program that solicited foreign investment in exchange for green cards. Although no charges were brought, a plan to build battery-powered vehicles at a plant in rural Mississippi fizzled.

Lawsuits by the state and unhappy Chinese investors followed. The company filed for bankruptcy in 2018.



Charles Xiaolin Wang attempted to bring an electric vehicle plant to Tunica, Miss., but the venture failed. (Peter L. Thomas / Tunica Times)

Saleen shrugged off the legal trouble, calling Wang, whom he's known for a decade, "very honorable and straightforward." The pair took a majority stake in the joint venture, dubbed Jiangsu Saleen Automotive Technology, with Wang as the chairman and Rugao pledging $1.1 billion in capital and loans. Saleen, the vice chairman, put up no cash, but the deal valued his expertise and technology at $800 million.

EXHIBIT E

It was a staggering amount, especially given Saleen's struggles in the U.S. Under the agreement, JSAT would pay his company tens of millions in fees to design and develop vehicles, including the S1 — Saleen's first all-new sports car in years — to be manufactured in Rugao for sale worldwide.

"Steve's vehicle is different from all other mass-produced vehicles" in China, Wang said. "It's high-performance and it requires a lot of technical specialty which, even today, nobody in China knows how to do."

The deal helped Saleen's U.S. company more than double its revenues, turning a $5.5-million loss in 2018 into a $2.5-million profit the following year, according to SEC filings. Saleen flew back and forth between the U.S. and China as JSAT opened a corporate office in Shanghai, built two production facilities in Rugao and hired about 1,000 employees.



An aerial view of the Jiangsu Saleen auto plant in Rugao, China. (Saleen Automotive Inc.)

Then came the July 2019 launch at the national stadium, the former Olympic venue dubbed the "Bird's Nest," on which Wang told Chinese media he spent more than $8 million. Besides the S1, Wang showed off three prototypes: a new S7, an SUV and a battery-powered two-seater called the Maimai, Saleen's entry into an overcrowded Chinese electric vehicle market dominated by the deep-pocketed Tesla.

The first JSAT model to go on sale in China, the petite Maimai left commentators scratching their heads. Its 109-horsepower motor and toylike design — some prototypes featured happy-

EXHIBIT E

face emojis on the hood, others a cartoon child on a bike — hardly matched Saleen's brawny brand.

In fact, the Maimai was an updated version of the MyCar, the low-speed vehicle that Wang had planned to build in Mississippi. Reaction to its shape, and hefty $22,000 price tag, was withering.



A Maimai electric vehicle on display in Jiangu Saleen's Beijing showroom in early 2020. (Tycho de Feijter)

"There are numerous superior (in performance, range and practicality) options available in the Chinese market at comparable or lower price points," concluded a moderator on the ChinaCarForums website.

The car was a failure. Six months after its release only 27 Maimais were registered in the entire country, according to one state media report.

<div align="right">EXHIBIT E</div>



The trouble at JSAT burst into public view in April, when a former legal officer, Qiao Yudong, posted a lengthy statement online alleging that Wang had sold the Rugao investors inferior technology backed by fraudulent valuations, and funneled cash to his wife and associates. Qiao claimed the Rugao government had spent close to $1 billion of public funds on a joint venture that had produced hardly any cars.

Wang rejected the allegations as the product of a disgruntled ex-employee, saying he had never controlled the company's accounts.

After an audit by the government investor, Nantong Jiahe Technology Investment and Development, a district court in June ordered the closure of the factories and Shanghai office. Police raided the production plant, ordered workers to leave and detained the company's German head of manufacturing, Frank Sterzer, for several hours until he was able to contact German diplomats to obtain his release. Sterzer, who remains in China, declined to comment.

EXHIBIT E



At Jiangsu Saleen's offices in Shanghai, employees posted a banner demanding salaries owed since the company shut down. (Saleen Automotive Inc.)

The Chinese investors seized control of the board last week and have filed suit against Wang, who has been at home in the Washington area during the COVID-19 pandemic. He said he has no plans to return to China, believing he won't get a fair trial.

As this was going on, Wang said he learned that the joint venture had quietly applied for auto design and technology patents related to Saleen's work in China, many not listing Saleen as the inventor. Saleen alleged his Chinese partners were plotting to push him out from the start.

EXHIBIT E

But according to their agreement, any intellectual property that springs from Saleen's work in China belongs to the joint venture. That could complicate his efforts to contest the patent filings, experts said.

"In a normal joint venture there is always some tech transfer," said Tycho de Feijter, an expert on the Chinese auto industry, who described the joint venture as a costly mismatch of expectations.

"Steve Saleen saw a lot of gold at the end of the Chinese rainbow, didn't do proper research into his partners and had no idea what he was getting into," De Feijter said. "Similar story for the Chinese side. They too saw gold where there wasn't any, had no experience in carmaking and no idea about what or who Saleen really was."

EXHIBIT E



Steve Saleen at the L.A. Auto Show in 2017. (Jae C. Hong / Associated Press)

Wang, 54, took responsibility for the venture's collapse.

"Steve is a genuine automotive guy; all he wants to do is make great cars," Wang said. "He may not want to hear me say this — I don't think he's a very sophisticated, cunning sort of businessman. His whole world is simply making cars. And I got him into this mess. I feel sorry for that."

EXHIBIT E

Saleen said it was too soon to judge the impact on his storied brand. But Saleen Automotive's most recent report to the SEC stated that the joint venture accounted for more than three-quarters of its income, and that "any reduction in business with JSAT would likely cause our revenues to materially decrease."

With negotiations over a U.S.-China phase 2 trade agreement stalled, Saleen said his experience should convince Washington to enact tougher protections for U.S. investors, deny Chinese firms that steal trade secrets access to capital markets and prohibit the use of Chinese asset valuations that could be subject to manipulation.

"It's too late for me," he said. "What I do hope is that all American companies learn from my bad experience."

🔲 View Comments

Terms and Privacy Policy    Your Privacy Choices ✔✖



# The key to TikTok Shop's blockbuster $4.9-billion quarter? The fastest-growing spenders aren't Gen Z — they're over 45

EXHIBIT E



@lopwert on TikTok/Tada Images/Shutterstock

**Victoria Vesovski**
Sat, May 2, 2026 at 12:05 PM PDT • 5 min read

 

TikTok made its name from viral trends and creator storytelling, but it's quickly becoming something else — a place where scrolling turns into spending. Its in-app marketplace, TikTok Shop, lets users buy products directly from videos and livestreams. Retailers from Ralph Lauren to Crocs are jumping in to capture that demand.

SRS**ACQUIOM** ELEVATE YOUR GAIN

Dedicated team.
Better experience.

Loan Agency at the speed

LEARN MORE  >

TikTok Shop pulled in $4.9 billion in U.S. sales in the first quarter, nearly doubling from a year earlier, according to Charm.io, as reported by the Wall Street Journal.

EXHIBIT E

# Must Read

- Thanks to Jeff Bezos, you can now become a landlord for as little as $100 — and no, you don't have to deal with tenants or fix freezers. Here's how

- Robert Kiyosaki says this 1 asset will surge 400% in a year and begs investors not to miss this 'explosion'

- Dave Ramsey warns nearly 50% of Americans are making 1 big Social Security mistake — here's how to fix it ASAP

"You want to be where the consumer is, and increasingly, that's obviously on social media and online," Olivia Tong, a managing director at Raymond James, told The Wall Street Journal.

Retailers may be chasing the coveted 14-29 Gen Z demographic, but the real twist is that the fastest-growing spenders on TikTok Shop aren't the younger users. According to data from Consumer Edge reported in The Wall Street Journal, spending on TikTok Shop is growing the most among those over 45 (1).



Score unlimited 2% cash back on all purchases

LEARN MORE

NAVY FEDERAL Credit Union

## Brands are adapting

Brands aren't just experimenting with TikTok Shop, some are building entire sales engines on it.

Haircare company Olaplex is one example. The brand first gained traction on the platform through tutorials and educational content, using short-form videos to explain how its products repair and strengthen damaged hair. Now, it's doubling down on that approach, but with a more direct path to checkout.

"Instead of having to leave TikTok Shop and go to our [website] or someplace else, they are able to purchase immediately," Olaplex CFO Catherine Dunleavy told The Wall Street Journal.

EXHIBIT E

The push comes at a critical time. Olaplex has faced growing competition and a prolonged sales slowdown, with net sales declining in 10 of the past 12 quarters, though they edged up 4.3% in the most recent quarter. Following its planned acquisition by Henkel, the brand is betting that TikTok Shop can help reignite growth (2).

"My expectation is that over time, it will be an incremental revenue driver," Dunleavy said.

The broader numbers suggest that the bet isn't unfounded. By the end of 2025, TikTok Shop had

Story Continues

View Comments

Terms and Privacy Policy    Your Privacy Choices

24/7 WALL ST

## Half of America Still Feels Financially Exposed Despite 8% Jump in Security

EXHIBIT E

tommaso79 / Getty Images

**David Beren**
Sat, May 2, 2026 at 3:45 AM PDT • 5 min read

 

## Quick Read

- Financial security among Americans improved to 50% from 44% year-over-year, but the personal savings rate declined even as disposable income rose, leaving households more vulnerable to price shocks.

- The 71% financial security rate among Americans with financial advisors versus 10% without reveals a stark divide driven by professional guidance access, while the half still feeling exposed relies on credit and speculative assets to compensate for eroding savings buffers.

- Are you ahead, or behind on retirement? SmartAsset's free tool can match you with a financial advisor in minutes to help you answer that today. Each advisor has been carefully vetted, and must act in your best interests. Don't waste another minute; learn more here.(Sponsor)

EXHIBIT E

The share of Americans who describe themselves as financially secure climbed from 44% to 50% in a single year, according to the Northwestern Mutual 2026 Planning & Progress Study. That is a meaningful shift after a stretch of post-pandemic anxiety, and it is the kind of headline that suggests household balance sheets are finally healing. The underlying data tells a more complicated story. Half the country still describes itself as exposed, and the conditions surrounding the survey help explain why the other half has not yet joined the recovery.

By several measures, the typical American household is in a stronger position than it was a year ago. Wages have continued to grow in nominal terms, unemployment has held in a range economists generally consider healthy, and disposable income has risen. On paper, more cash is flowing through the average household than at almost any prior point in the survey's history.

## Why the Other Half Still Feels Exposed

The savings buffer that usually accompanies an income recovery has not formed, and that absence is doing real damage. The personal savings rate has fallen steadily over the past two years even as disposable income has climbed, which means the additional earnings are being absorbed by higher costs rather than building any meaningful cushion. Households taking home more while keeping less of it are structurally more exposed to price shocks, not less, and the current inflation environment has delivered those shocks consistently.

EXHIBIT E

Are you ahead, or behind on retirement? SmartAsset's free tool can match you with a financial advisor in minutes to help you answer that today. Each advisor has been carefully vetted, and must act in your best interests. Don't waste another minute; learn more here.(Sponsor)

That backdrop shows up clearly in how Americans describe their own situation. Inflation ranks

**Story Continues**

🗨 **View Comments**

Terms and Privacy Policy    Your Privacy Choices ✓✗



**꘠moneywise**

# Texas man allegedly rang up 800 mac & cheese trays at Chick-fil-A that fired him — refunding $80K before he was caught

EXHIBIT E




City of Grapevine, Ken Wolter / Shutterstock

**Rudro Chakrabarti**
Sat, May 2, 2026 at 3:45 AM PDT • 5 min read

 

A former Chick-fil-A employee in Grapevine, Texas has been arrested and charged with felony theft, money laundering and evading arrest in connection with an alleged scheme to steal more than $80,000 from the store that fired him. Police say he allegedly rang up roughly 800 mac & cheese trays on the register and refunded every one of them to his personal credit cards.

According to the Grapevine Police Department, Keyshun Darnell Jones was let go from the franchise in October 2025. About a month later, surveillance video appeared to show him standing behind the counter without authorization and processing refund transactions at the store's register.

## Must Read

- Thanks to Jeff Bezos, you can now become a landlord for as little as $100 — and no, you don't have to deal with tenants or fix freezers. Here's how

- Robert Kiyosaki says this 1 asset will surge 400% in a year and begs investors not to miss this 'explosion'

EXHIBIT E

Franchise owner Jarvis Boyd reported the suspected theft in November 2025 (1). Police say Jones evaded multiple arrest attempts before the Texas Attorney General's Fugitive Task Force and Fort Worth Police finally took him into custody on April 17, 2026 (2).

Tarrant County booking records show Jones was charged with property theft of $30,000 to $50,000 and money laundering of $30,000 to $50,000, both felony brackets, plus evading arrest. Bail was set at $5,000, and he is scheduled to appear in court June 4 (3). He has not been convicted and the charges remain allegations.

## How the alleged Chick-fil-A scheme worked

Mac & cheese is one of Chick-fil-A's higher-ticket sides, with catering trays running into the tens of dollars at most locations. That price point makes it easy to cheese refunds without any one transaction looking suspicious.

According to police, Jones allegedly used the restaurant's point-of-sale system to enter food orders and then issue refunds, with the money allegedly directed to his own credit cards rather than to a card that had ever been used to pay for anything. Police haven't publicly said whether other employees were on shift during the alleged transactions, or how Jones, fired weeks earlier, got behind the counter in the first place.

The sheer volume of 800 refunds suggests the alleged activity ran for weeks before anyone reconciled the books closely enough to notice, which isn't uncommon in fast-food chains.

## The $103 billion refund fraud lanscape

Consumers returned $685 billion worth of items in 2024, equal to 13.21% of total retail sales, with $103 billion of those losses tied directly to return and claims fraud (4). A big chunk of those

Story Continues

💬 View Comments (10)

EXHIBIT E

# Why Founders Need to Build Trust Before They Can Monetize Attention

**Boris Dzhingarov**
Fri, May 1, 2026 at 11:30 PM PDT • 6 min read

 

Alona Horkova | Getty Images

*Entrepreneur Media LLC and Yahoo Finance LLC may earn commission or revenue on some products and services through the links below.*

## Key Takeaways

- We live in an era where going viral is often a repeatable process rather than a random stroke of luck.

EXHIBIT E

- Engineered attention can grow your audience fast, but one bad monetization decision can permanently destroy the trust that makes it valuable.

Generating attention is no longer a dark art. It is a highly predictable engineering problem. Between algorithmic hooks, short-form video mechanics and optimized content funnels, fast-growing founders and operator-led brands can manufacture reach at an unprecedented scale.

We live in an era where going viral is often a repeatable process rather than a random stroke of luck. But while attention can be engineered with the right playbook, trust cannot. For founders building a sustainable business, confusing these two distinct assets is a fatal commercial mistake.

## The monetization trap

The moment a founder, creator or operator achieves real scale, whether that means tens of thousands of dedicated newsletter subscribers or hundreds of millions of video views across platforms, the monetization pressure begins. The inbox inevitably fills with partnership offers, sponsorship deals and affiliate opportunities. On paper, these deals look like pure margin. They offer immediate, high-yield cash flow for simply inserting a pre-roll ad, posting a link or sending a dedicated email.

In reality, many of these offers are highly toxic loans taken directly against your brand's equity. As the audience's value grows, the inbound offers become increasingly aggressive. They often rely on fake urgency, manufactured authority, or opaque value propositions designed to separate your followers from their capital as quickly as possible. For founders, the real business choice is rarely about *whether* they should monetize, but *how* they can do so without creating irreversible reputational damage.

## The cost of manufactured virality

This tension is particularly visible in high-stakes, high-reward niches like finance and fintech, where the cost of bad advice is devastating. Consider the trajectory of Ivan Patriki, a fintech marketing expert, founder of Amora Media, and co-founder and growth operator at QuantMap. Patriki sits at the exact intersection of attention economics, creator growth and monetization pressure. Having built a large finance audience and generated hundreds of millions of views, he understands intimately that modern virality is deliberately engineered. He has seen exactly how creator funnels in the finance space are built, moving audiences systematically from short-form discovery to long-form authority, and finally into high-ticket conversion funnels.

EXHIBIT E

Story Continues



View Comments

Terms and Privacy Policy Your Privacy Choices 

moneywise

# A 73-year-old lost her $300K life savings to AI crypto scammers — and now lives in assisted care on Medicaid

CBS News

Eric Esposito
Mon, April 27, 2026 at 12:05 PM PDT • 5 min read

 

Kyle Holder, 73, spent decades building up $300K for retirement. But within about three months, one AI-powered crypto scam stole everything.

EXHIBIT E

According to *CBS News*, this story began in December 2024 when Holder got a message on WhatsApp advertising a crypto investment course. At the time, Holder was in a vulnerable position. A recent injury meant she didn't have a way to work in her profession as an occupational therapist (1).

## Must Read

- Thanks to Jeff Bezos, you can now become a landlord for as little as $100 — and no, you don't have to deal with tenants or fix freezers. Here's how

- Robert Kiyosaki says this 1 asset will surge 400% in a year and begs investors not to miss this 'explosion'

- Dave Ramsey warns nearly 50% of Americans are making 1 big Social Security mistake — here's how to fix it ASAP

Holder told *CBS News* she "thought maybe this was a way that I could use my time, start something new and make money, to carry me into my older years." (2)

After replying to the initial message, Holder got in touch with someone called "Niamh," who presented herself as a sympathetic single parent. Niamh and a mysterious member of the "customer service team" then taught Holder how to create crypto wallets and transfer tokens.

At first, Holder only sent a tiny amount, but she saw thousands appear back in her crypto wallet shortly afterward.

EXHIBIT E

After that initial "win," things got very dark very fast. Niamh played with Holder's heartstrings, claiming that, "The money I lent you includes child support for my daughter Alice and even some of the funds obtained through loans."

Over the next two months, Holder transferred a total of $300K to 14 crypto wallets connected to this scam operation.

When her savings dried up and no money reappeared in her wallet, Holder became desperate. She asked Niamh point-blank if this was a scam.

In response, Niamh said Holder made a "fatal mistake" by sending digital assets to the wrong crypto wallet address. To add insult to injury, Niamh wrote, "Oh my goodness, honey, how could you make such a little mistake?"

As the harsh reality set in, Holder fell into a deep depression that left her bedbound. A few weeks later, social services brought Holder to a hospital, and she's now in an assisted living facility with the help of Medicaid.

## Deepfakes and digital coins are defrauding millions

EXHIBIT E

Story Continues

💬 View Comments (3)

Terms and Privacy Policy     Your Privacy Choices ✓✕



# California hospice fraud exposed after woman falsely enrolled, locked out of Medicare for months

Courtesy of Fox News

EXHIBIT E

Monique Danao
April 26, 2026 • 5 min read

A startling case out of California is raising fresh concerns about fraud in the U.S. health care system and how easily it can disrupt patients' access to care.

During a recent congressional hearing (1), Sheila Clark, president and CEO of the California Hospice and Palliative Care Association, described what she says is widespread abuse in the hospice industry. Her testimony highlighted cases of "phantom" providers, organizations that appear legitimate on paper but don't actually operate in any meaningful way.

## Must Read

- Thanks to Jeff Bezos, you can now become a landlord for as little as $100 — and no, you don't have to deal with tenants or fix freezers. Here's how

- Robert Kiyosaki says this 1 asset will surge 400% in a year and begs investors not to miss this 'explosion'

- Dave Ramsey warns nearly 50% of Americans are making 1 big Social Security mistake — here's how to fix it ASAP

"You'd be amazed at how many hospices … You can walk up to the door in California, and there is nobody there," Clark told lawmakers. "There are five months' worth of mail stacked up, and nobody's there. And that passed a survey. How did that happen?"

In one striking example, she questioned how a hospice could be registered at what appeared to be a burrito stand or even a tire store, locations that should never pass regulatory scrutiny.

## A system vulnerable to fraud

Hospice care, which supports patients nearing the end of life, is funded in large part by Medicare. That makes it a lucrative target for fraudsters, particularly when oversight gaps exist.

Clark warned (2) that a surge in hospice providers across California has exposed weaknesses across multiple layers of regulation, from licensing and certification to accreditation. Some of these providers, she said, exist "in name only," with no patients, staff or real operations.

The implications go beyond wasted taxpayer dollars. Fraudulent providers can interfere with legitimate patient care, delay services and erode trust in the health care system.

EXHIBIT E

Lawmakers are now under pressure to investigate the scale of the problem, especially after reports of tens of millions of dollars in suspected Medicaid tied to hospice operations

Case 4:25-cv-00931-D   Document 78-3   Filed 06/16/26   Page 73 of 76   PageID 1088

## 'It was terrifying'

For Dr. Lynn Ianni, the issue isn't abstract. It's personal.

The California-based psychotherapist told lawmakers she was locked out of her own Medicare benefits for months after being mistakenly enrolled in hospice care without her knowledge.

**Story Continues**

🗨 View Comments (61)

Terms and Privacy Policy    Your Privacy Choices ✔✕



# Is Identity Theft Insurance Worth It? What Clark Howard Thinks

charliepix / iStock via Getty Images

**Carl Sullivan**
April 26, 2026 • 4 min read

 

## Quick Read

- Identity theft insurance policies often provide a false sense of security while excluding coverage for the accounts most vulnerable to theft, such as brokerage and investment accounts.

- Federal protections like Regulation E ($50 liability cap on unauthorized electronic bank transfers) and the Fair Credit Billing Act ($50 liability on credit card fraud) are often stronger than paid insurance policies.

EXHIBIT E

- Are you ahead, or behind on retirement? SmartAsset's free tool can match you with a financial advisor in minutes to help you answer that today. Each advisor has been carefully vetted, and must act in your best interests. Don't waste another minute; learn more here.(Sponsor)

Millions of Americans worry about theft of their financial identity and personal data. Wayne from New York recently called The Clark Howard Podcast to ask if identity theft insurance is worth it. He's paying $75 a year for a policy advertising up to $1 million of zero-deductible identity theft insurance coverage. The program monitors his email, Social Security number, phone, driver's license, passport, medical, bank, and credit cards.

"People buy them, and then they feel like they have peace of mind," Howard said. "But I've never found the supposed coverages — that sound impressive — to actually be worth it."

Howard said the programs can offer a false sense of security that keeps people from doing the free work that actually prevents loss, while criminals increasingly target the accounts these policies quietly exclude. Insurance contracts pay only for what they specifically name.

Are you ahead, or behind on retirement? SmartAsset's free tool can match you with a financial advisor in minutes to help you answer that today. Each advisor has been carefully vetted, and must act in your best interests. Don't waste another minute; learn more here.(Sponsor)

"If they don't say they cover losses from theft from brokerage accounts and bank accounts, they don't cover losses from brokerage and bank accounts," Howard said. Wayne's policy listed unauthorized electronic fund transfers, lost wages, private investigator costs, legal defense fees. Notice what is missing: direct reimbursement for stolen investment balances.

Free federal protections are often stronger than the insurance policies. Regulation E caps consumer liability on unauthorized electronic bank transfers at $50 if reported within two

Story Continues

View Comments

Terms and Privacy Policy    Your Privacy Choices ✓✕

## Recommended Stories

EXHIBIT E

We're unable to load stories right now.



Copyright © 2026 Yahoo.
All rights reserved.

 

## Trending Topics

Dow Jones

S&P 500

DAX Index

Nvidia

Tesla

DJT

Tariffs

## Explore Further

Mortgages

Credit Cards

Sectors

Crypto Heatmap

Financial News

## About

Data Disclaimer

EXHIBIT E

Help

Feedback

Sitemap

Licensing

What's New

About Our Ads

Premium Plans

Terms and Privacy Policy

Your Privacy Choices

EXHIBIT E